## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **GARY BLITCH, DAVID KNIGHT, and** | * | |
| **DANIEL SNYDER** | * | |
| | * | **CIVIL ACTION NO.: 16-17596** |
| *Plaintiffs,* | * | |
| | * | **DISTRICT JUDGE:** |
| **VERSUS** | * | **LANCE M. AFRICK** |
| | * | |
| **The CITY OF SLIDELL; FREDDY** | * | **MAGISTRATE JUDGE:** |
| **DRENNAN, in his official capacity; and** | * | **KAREN WELLS ROBY** |
| **EUGENE HOWARD, in his official** | * | |
| **capacity,** | * | |
| | * | |
| *Defendants.* | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

**MAY IT PLEASE THE COURT:**

The City of Slidell, Freddy Drennan, and Eugene Howard (hereinafter "Slidell" or "the City of Slidell") seek to enforce a reasonable permit system that does not infringe on any alleged First Amendment rights of a panhandler while protecting the public safety of Slidell in recognition of a documented problem within the greater community.  In contrast, the Plaintiffs seek to strike this ordinance as an impermissible restriction of a constitutional right despite (1) the fact that panhandling has not even been recognized as a protected right under the First Amendment by the United States Supreme Court, many federal appellate courts, and this jurisdiction and (2) the lack of any government control over the actual content of a panhandler's expressive communication.  While the permit system established by Slidell can withstand even strict scrutiny, it should be more appropriately categorized as a reasonable restriction on the

manner of a panhandler's expressive communication and therefore only subject to intermediate scrutiny.

## I.     SLIDELL ORDINANCE

### A.  Description of Slidell Ordinance

In response to an increasing problem with panhandling within the City of Slidell, the Slidell City Council passed Ordinance No. 3826, which revised Criminal Code Chapter 11, Section 207 of the Code of Ordinances for the City of Slidell to require a permit for any person wishing to panhandle within the city limits.  Under this original version of the ordinance, there was a forty-eight (48) hour waiting period between when an applicant initially applied for a permit and when the permit was actually granted, thereby allowing an applicant to begin panhandling.  The City Council passed Ordinance No. 3826 on July 12, 2016.

In response to the initiation of the captioned lawsuit and to address the Plaintiffs' primary concern with the original ordinance, on March 28, 2017, the Slidell City Council passed a revised version of Criminal Code Chapter 11, Section 207 of the Code of Ordinances for the City of Slidell (hereinafter "the Slidell ordinance" or "the ordinance").[1]  This ordinance, entitled "Begging, Panhandling, Permit Required," requires that anyone wishing to panhandle within the limits of Slidell must obtain a permit prior to engaging in any panhandling activity.[2]

The ordinance lays out a two-step process by which an applicant may obtain a permit.[3] First, the applicant must file for a conditional/temporary permit with the Slidell police department.[4]   The applicant is immediately given the conditional/temporary permit, which is valid for seventy-two (72) hours, after completing an application with basic identification

---

[1] Ordinance No. 3851, attached hereto as Exhibit 1.
[2] *Id.* at (a).
[3] *Id.* at (b).
[4] *Id.* at (b)(1).

information.[5]   An applicant shall be granted a permit to panhandle, valid for one (1) year, after

the conditional/temporary has expired.[6]   There are only five reasons why a permit to panhandle

would not be granted, all of which are objectively defined by the terms of the ordinance.  These

reasons include: (1) a false or fraudulent statement in the application; (2) conviction of violating

another panhandling ordinance within the past year of the application; (3) two or more violations

of the Slidell Criminal Code within five years of the application; (4) convictions of two or more

offenses involving assault, threats, illegal use of weapon within five years of the application;

and/or (5) conviction of at least one homicide within twenty years of the application.[7]   In short,

any applicant will receive a permit unless he or she has a criminal history of aggressive

panhandling or violence against others – a result completely in line with the City's intended

purpose of this ordinance, mainly, public safety.

Further, a person who receives a permit to panhandle through this process must display

the permit at any time they are engaging in panhandling activity.[8]   This aspect of the ordinance

that requires a panhandler to display a panhandling permit essentially amounts to the panhandler

wearing a name tag, again, for public safety purposes.

Additionally, the Slidell ordinance provides an appeal process for the applicant if the

permit application is denied or the permit is subsequently revoked after being granted.  The

applicant may appeal the denial of a permit to the chief administrative officer for Slidell, while

the applicant may appeal the revocation of a permit to the chief of police.[9]

Significantly, there are two very noticeable restrictions missing from the Slidell

ordinance.  First, the Slidell ordinance does not prohibit panhandling.  Second, it does not require

---

[5] *Id.*
[6] *Id.* at (b)(2).
[7] *Id.* at (b) (2) (i) – (v).
[8] *Id.* at (f).
[9] *Id.* at (c) and (e).

a city official to examine the content of any materials and/or speech that the applicant wishes to express during the act of panhandling.

Finally, this ordinance was passed with the intent to minimize any intrusion on an applicant's First Amendment rights, if any, to panhandle.[10]   Rather, this ordinance was designed to address increasing public concerns about the prevalence of panhandling and associated safety concerns.[11]   Out of an abundance of caution and with respect for the constitutional rights of individuals in the Slidell community, Slidell agreed to forego enforcement of the ordinance pending a final judgment in this litigation.[12]

### B.  History of Litigation

The captioned matter was filed by the American Civil Liberties Union on behalf of three (3) plaintiffs, Gary Blitch, David Knight, and Daniel Snyder.  Each of the three Plaintiffs claims to be a panhandler in Slidell and alleges the ordinance will limit his ability to panhandle.[13]   The Plaintiffs' Original Complaint was accompanied by a Motion for Preliminary Injunction,[14] which was denied as moot based on Slidell's agreement to forego enforcement of the ordinance during the pendency of this litigation.   As a result, none of the Plaintiffs has been denied a permit under the Slidell ordinance, much less even applied for a panhandling permit.

On March 15, 2017, the Court requested each side in the captioned matter to prepare a motion for summary judgment.[15]

---

[10] *See* Affidavit of Jay Newcomb, attached hereto as Exhibit 2.
[11] *Id.*
[12] Rec. Doc. 21.
[13] *See* Rec. Doc. 2, ¶24.
[14] *See* Rec. Doc. 4.
[15] *See* Rec. Doc. 21.

### C. Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a). A genuine dispute as to a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Rogers v. Bromac Title Servs., Inc., L.L.C.*, 755 F.3d 347, 350 (5th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

## II.   UNCLEAR   TREATMENT   OF   PANHANDLING   UNDER   FIRST AMENDMENT

This is not a case examining the alleged restriction of a firmly established constitutional right. Panhandling has not been recognized by the United States Supreme Court as a constitutional right protected by the First Amendment, despite the Plaintiffs' foregone conclusion that this is an indisputable right.[16] Additionally, neither the United States Fifth Circuit Court of Appeal nor any of its district courts (including the Eastern District of Louisiana) has held that panhandling is a constitutionally protected right. In short, there is no controlling jurisprudence requiring that panhandling be given full protection under the First Amendment.

Furthermore, to the extent that some of the federal appellate courts have recognized panhandling as a protected speech, they have done so in a markedly different factual context than in the captioned matter. In each of the cases cited by the Plaintiffs in their Motion for Preliminary Injunction for the proposition that solicitation has "long been deemed protected by the First Amendment,"[17] the courts analyzed per se probations on panhandling that specifically

---

[16] *See e.g.*, *Speet v. Schuette*, 726 F.3d 867, 874 (6th Cir. 2013) ("While the United State Supreme Court has not, as Michigan correctly points out in its brief, directly decided the question of whether the First Amendment presents soliciting alms when done by an individual, the Court has held – repeatedly – that the First Amendment protects charitable solicitation performed by *organizations*.") (emphasis added).

[17] *See* Rec. Doc. 4-1, pg. 7.

defined solicitation as a form of expressive communication – a very distinct restriction from the narrowly tailored permit system established by the Slidell ordinance that was designed to allow for the full expression of the panhandler's First Amendment rights.

For example, in *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 552 (4th Cir. 2013), the Fourth Circuit was highly critical of a local ordinance that prohibited solicitation "on the Downtown Mall within fifty (50) feet (in any direction) of 2nd Street West and 4th Street East, when those streets are open to vehicular traffic." However, the court did not actually rule on the constitutionality of the statute due to the procedural posture of the case, instead remanded the case to allow additional evidence. *See also Speet v. Schuette*, 726 F.3d 867, 874 (6th Cir. 2013) (analyzing statute that provided for blanket prohibition on begging); *A.C.L.U. of Nevada v. City of Las Vegas*, 466 F.3d 784 (9th Cir. 2006) (prohibition on solicitation in certain tourist areas); and *Loper v. New York City Police Department*, 999 F.2d 699 (2nd Cir. 1993) (blanket prohibition on begging in public places). Notably, unlike each of the above cases, the Slidell ordinance does not impose a per se prohibition on panhandling, and it does not seek to censor any expressive communication on the part of the panhandler.

More significantly, not a single case that the Plaintiffs cited involved a permit scheme for panhandling, a difference that should significantly alter this court's analysis of the Slidell ordinance in this matter. Further, the fact that panhandling has not been universally recognized as protected by the First Amendment like political and religious speech also makes this case distinct from other permitting cases like *Watchtower Bible & Tract Society of New York, Inc. v. Village of Stratton*, 536 U.S. 150 (2002), which addressed the effect of a permitting scheme on religious and political speech.

Even assuming for purpose of this motion that panhandling is protected by the First Amendment, this does not mean that the right to panhandle is unfettered.  Like other First Amendment rights, the right to panhandle would be subject to restrictions, including reasonable time, place, and manner regulations.[18]   In the same case where the United States Supreme Court recognized that charitable solicitation on behalf of an organization falls within the protection of the First Amendment, it also clearly upheld a municipality's ability to exercise "its power to regulate solicitation" provided that it does not "unnecessarily interfere[] with First Amendment freedoms."  *See Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 637 (1980).

This is precisely the question before the Court today – whether the permitting system established under the Slidell ordinance is a reasonable regulation of a panhandler's alleged First Amendment rights.  The answer to this question is an undoubtable yes.

## III.    CONTENT ANALYSIS OF SLIDELL ORDINANCE

To review the constitutionality of a statute potentially impacting First Amendment rights, the statute must be classified as either content-based or content-neutral to determine the proper level of scrutiny.   In their challenge to the Slidell ordinance, the Plaintiffs allege that the Slidell ordinance is an improper content-based and viewpoint discriminatory restriction on their First Amendment rights to panhandle.[19]   The Slidell ordinance is arguably content-based solely on the fact that it applies to a particular kind of speech, regardless of the fact that it contains no

---

[18] *See, e.g.*, *Loper v. New York City Police Dept.*, 999 F.2d 699, 704 (2nd Cir. 1993) ("Having established that begging constitutes communicative activity of some sort and that, as far as this case is concerned, it is conducted in a traditional public form, we next examine whether the statute at issue: (1) is necessary to serve a compelling state interest and is narrowly tailored to achieve that end; or (2) can be characterized as a regulation of the time, place and manner of expression that is content neutral, is narrowly tailored to service significant government interests and leaves open alternate channels of communication."); *Chatterbuck v. City of Charlottesville*, 708 F.3d 549 (4th Cir. 2013) ("The government may impose reasonable content-neutral time, place, and manner restrictions that are narrowly tailored to serve a significant government interest and leave open ample alternative channels of communication." (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).

[19] *See* Rec. Doc. 1.

regulation of the expressive content of that speech.   Additionally, it is a viewpoint neutral regulation.  The Slidell ordinance can survive the required strict scrutiny test for a content-based regulation because it furthers the compelling safety needs of Slidell and is narrowly tailored to further that compelling need without any restriction on the expressive communication of the panhandler.

### 1.  Content-Neutrality under *Reed*

In *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218 (2015), the United States Supreme Court clarified the proper analysis to distinguish between a content-based and a content-neutral statute, the initial step of a First Amendment analysis.  The *Reed* Court considered whether the First Amendment rights of the plaintiffs, a local church and its pastor, were violated by the municipality code regulating the display of outdoor signs.  The code provisions at issue required a permit for the display of outdoor signs, but there were some twenty-three exemptions from this rule, three of which were at issue in this particular case.  *Id.* at 2224-25.  The signs that the plaintiffs used to advertise their worship services fell within one of those exemptions.

After being cited by the town's officials on separate occasions, the plaintiffs brought suit. Both the district court and the Ninth Circuit upheld the town's sign regulations, with the Ninth Circuit holding that the regulations were content-neutral on two bases: (1) that the distinctions among the different categories of signs were "based on objective factors" and did not "otherwise consider the substance of the sign" and (2) that the town proved that its "'interests in regulat[ing] temporary signs are unrelated to the content of the sign.'"  *Id.* at 2226 (citing *Reed*, 707 F.3d 1057, 1069, 1071-72 (9th Cir. 2013)).

In light of the lower court's decision and its own precedents, the Supreme Court provided a two-step analysis to distinguish a content-based restriction from a content-neutral restriction.

A "government regulation of speech is content based if a law applies to a particular speech because of the topic discussed or the idea or message expressed." *Id.* at 2227 (citations omitted). The Court went on to hold that a particular statute's content-neutrality must be determined on its face before the government's justification for such a regulation is examined. *Id.* at 2228.

The Court emphasized its clarification of this point of law from lower court decisions that had seemingly blurred the content-neutrality analysis with government justification for the statute. In other words, the Court clearly delineated these two prongs of First Amendment analysis: "the crucial first step in the content-neutrality analysis [is] determining whether the law is content neutral on its face. A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Id.* at 2228 (citing *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 419, 429 (1993)). Applying the strict scrutiny analysis required for content-based statutes, the Court held that the town had not offered a compelling interest for the sign regulations and that the regulations were not sufficiently narrowly tailored to further the government interests proffered by the town. *Id.* at 2231-32.

*Reed* is a significant case in its clarification of the content-neutrality test. There were three concurring opinions in which six of the justices joined,[20] which opine extensively on the implication of this decision, including the rigidity of the strict scrutiny analysis imposed by the majority. Further, it is yet to be seen how *Reed* will affect lower courts' analysis of these First Amendment classifications.[21] For example, in cases pre-dating *Reed*, the Fifth Circuit

---

[20] Two of the concurring opinions were concurrences with the judgment of the Court only.

[21] Likewise, only one district court in Louisiana has cited *Reed*. As the Fifth Circuit did prior to the Court's decision in *Reed*, the Middle District of Louisiana stated that "the government's purpose is the controlling consideration in discerning content-based regulations from content-neutral regulations." *Garden District Book Shop, Inc. v. Stewart*, 184 F. Supp. 3d 331, 338 (M.D. La. 2016) (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). This clearly shows there is continued confusion among the lower courts as to the importance of the government's purpose in determining whether a particular statute is content-neutral even in the wake of *Reed*.

consistently took into account the government's motive in enacting the statute to determine if the statute was content-neutral or content-based, thereby triggering the corresponding level of scrutiny. *See Asgeirsson v. Abbott*, 696 F.3d 454, 460 (5th Cir. 2012) ("Content-neutrality has continued to be defined by the justification of the law or regulation, and this court has consistently employed that test." (citing nine different Fifth Circuit opinions spanning some two decades)). The Fifth Circuit has not yet applied *Reed* in a majority opinion at the time this motion was filed, but it has been cited in an extensive dissenting opinion. *See Defense Distributed v. United States Dep't of State*, 838 F.3d 458 (5th Cir. 2016).[22] As a result, it is likely that much of the Fifth Circuit precedent on content-neutrality determination will need to be viewed in light of *Reed*.

### 2. Application of *Reed* to Slidell Ordinance

It appears that *Reed* is the controlling test for strict scrutiny with regard to content-neutrality. As a result, the Slidell ordinance is likely to be considered content-based because it refers to only one type of particular speech.

However, applying the facial content-neutrality test in *Reed* fails to take into account the fact that there is no actual censorship of expressive content of the panhandler's speech in the Slidell ordinance. It is extremely significant what the Slidell ordinance does *not* regulate, namely, the content of the proposed panhandling speech. An applicant seeking a permit to panhandle is not required to have his or her intended communication reviewed by a government authority. For example, a panhandler is never required to present the sign he or she uses while panhandling during the application process. Likewise, the Slidell ordinance does not restrict

---

[22] In her dissenting opinion, Judge Jones cited *Reed* and found that the statute before the Court was a content-based regulation of speech. *Defense Distributed*, 838 F.3d at 470.

what an applicant may say or how the applicant chooses to otherwise express himself when panhandling.

This is in marked contrast to *Reed* in which a government authority had to review a sign's contents in order to determine whether the sign fell within the required permit's exemptions, thereby calling into question the possibility of censorship of a particular message's content. Instead, by applying for a panhandler permit, the panhandler himself is informing the government of the type of speech in which he wishes to engage, and Slidell has no authority to review or deny the panhandler's permit based on the content of his speech.   This eliminates the very risk of censorship that the application of strict scrutiny is designed to prevent.

In short, while the Slidell ordinance is technically content-based in that it refers to a type of speech to determine the ordinance's applicability, it does not contain any element of censorship, which underlies the strict scrutiny analysis.

### 3.  Slidell Ordinance Is Viewpoint Neutral

Consistent with its lack of content censorship, the Slidell ordinance is a viewpoint neutral regulation.   The City of Slidell requires any person wishing to solicit – whether it be an individual panhandling or a traditional charitable organization – to register with the City prior to engaging in such behavior.[23]   Accordingly, all solicitation is treated equally under Slidell's Code of Ordinances, thereby rendering the Slidell ordinance at issue viewpoint neutral.

Reading the Slidell ordinance *in pari materia* with other provisions of Slidell's Code of Ordinances, it is evident that panhandling, like all other forms of solicitation, requires a permit under Slidell law.   Slidell Municipal Code Section 20-4(a) states, in relevant part, as follows: "Except as otherwise provided for by this chapter, no person shall conduct business within this jurisdiction as a peddler or solicitor, without first obtaining a city license. Solicitors need not be

---

[23] *See* Slidell Municipal Code § 20-4, attached as Exhibit 3.

licensed but are required to register with the city pursuant to section 20-8."[24]  The Code provides

the following requirements for a solicitor's registration: "All solicitors…shall be required to

register with the city prior to engaging in those activities.  Registration shall be made on the

same form required for a license application, but no fee shall be required."  *See* Slidell Code Sec.

20-8(a).[25]  The license application is composed of nineteen (19) different categories of

information ranging from identification of the person applying to be a solicitor to descriptions of

the type of business in which the solicitor is engaging.  *See id.*  at 20-8(b).

The solicitation registration is far-ranging in its application.  Section 20-8(f) specifically

states that "professional fundraisers" are not exempt from the licensing requiring contained in

this particular statute.  Further, the statute makes evident that nonprofit corporations are also

subject to registration prior to solicitation within the limits of Slidell:

> Nonprofit corporations…shall be exempt from the provision of this chapter
> [license requirement] upon obtaining a fee free city permit by producing a copy of
> their certificate of incorporation as described by R.S. 12:206 and signing the
> appropriate city form attesting to their nonprofit nature and having such form duly
> notarized by a licensed notary of St. Tammany Parish.  *Such city permits or a
> copy of such permits must be carried on the persons at all time while engaged in
> such activity regulated by this chapter and must be produced on demand when so
> requested by any official or citizen of the city.*  Fee free permits issued under the
> requirements of this section shall be valid only from 8:00 a.m. to 7:00 p.m. during
> Daylight Saving Time and 8:00 a.m. to 5:00 p.m. during Standard Time in the
> area of the city zoned residential, and shall not be valid for solicitors upon any
> property posted with a "No Peddlers or Solicitors" or "Peddler and Solicitors
> Prohibited" sign or placard or other comparable statement.

*Id.* at 20-4(g)(3) (emphasis added).  Like the Slidell ordinance at issue in the captioned matter,

there is no attempt at censorship on the part of the Slidell with regard to other forms of

solicitation.   The actual speech or expressive activity of the person and/or organization soliciting

is not regulated at all by the Slidell ordinances.

---

[24] *See id.*
[25] *See* Slidell Municipal Code § 20-8, attached hereto as Exhibit 4.

By looking at the full body of the Slidell ordinances, it becomes clear that Slidell requires registration and/or permitting for any type of solicitation activity – *whether it is through panhandling or soliciting donations on behalf of a nonprofit organization*.   Panhandling is not singled out for permitting because it is disfavored, but it is instead subjected to a similar permitting system as all other solicitation within the city.

In short, while the Slidell ordinance is necessarily content-based in order to define the conduct to which it is applicable, it is not viewpoint discriminatory and therefore does not have an adverse effect on the marketplace of ideas introduced to the Slidell community.

## IV.   ORDINANCE FURTHERS COMPELLING PUBLIC SAFETY NEED

In light of the Slidell ordinance's likely classification as a content-based regulation, it must survive strict scrutiny to be enforced.   Strict scrutiny is a two pronged analysis that determines whether the regulation at issue "furthers a compelling interest and is narrowly tailored to achieve that interest."   *Reed*, 135 S. Ct. at 2231 (internal quotation and citation omitted).   The Slidell ordinance passes strict scrutiny analysis because it was enacted to further a compelling government interest of public safety and is narrowly tailored to serve that interest without infringing on the alleged First Amendment rights of panhandlers.

Closely related to the compelling government interest in a statute, prior to *Reed*, the government's motivation in enacting a particular regulation was often viewed as determinative to the content-neutrality of that regulation.   In fact, the Supreme Court has repeatedly emphasized the importance of the government's motivation in enacting a particular statute.   In *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989), the Court explained this consideration as follows: "[t]he principal inquiry in determining content neutrality…is whether the government has adopted a regulation of speech because of disagreement with the message it conveys."   Further,

"[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Id.* (citing *Renton v. Playtime Theaters, Inc.*, 475 U.S. 41, 47-48 (1986)).   However, in the wake of *Reed* and its focus on facial determination of content-neutrality, the government motivation can now be analyzed as part of the compelling need justifying an alleged content-based restriction on speech.

### 1.  Compelling Government Interest of Public Safety

The Slidell ordinance is directly tied to the City of Slidell's compelling interest of public safety.  Panhandling has become an increasing cause of concern among the citizenry of Slidell over the past several years and which is documented or proven by the number of complaints) received by the Slidell Police Department about panhandling.   As a result, the Slidell City Council decided to enact the ordinance at issue to remedy the public safety issues caused by an increased number of panhandling related complaints within Slidell.[26]

The sheer number of arrests and complaints involving panhandling is telling.[27]  Of the 121 arrests made for a violation of any of Slidell's solicitation ordinances since 1997,[28] 79 of those arrests have been for panhandling.[29] Due to the increasing inability to identify panhandlers, the number of arrests for panhandling has actually decreased in the last five years – a marked contrast to the number of complaints about panhandling, which has dramatically increased since 2015.

Slidell police records indicate they have investigated at least 70 complaints since 2015, which have either been categorized as solicitation-based offenses or which describe panhandling

---

[26] *See* Exhibit 2.
[27] *See* Summary Chart of Police Records, attached as Exhibit 5-A & 5-B.
[28] *See* Affidavit of Nicholas Mistretta, attached as Exhibit 6, at Exhibit A.
[29] *Id.* at Exhibit B.

within the offense narrative of the police report.[30]  What makes this number so startling is the complaints only date back two years whereas the arrests for solicitation date back over a period of two decades.   This clearly indicates a rise in panhandling, and a corresponding concern among the citizens of Slidell.

The fact that there are so many complaints about panhandling without any identification of the perpetrators strongly underscores the need behind the Slidell ordinance's requirement for permitting and identification of the panhandlers.  Of the 70 complaints about panhandling, only 14 complaints were associated with an identifiable person.[31]   Without any identification of the person panhandling and the subject of these complaints, the Slidell police are unable to enforce the laws.

These numbers paint a clear picture of a compelling need for the Slidell ordinance – public safety.

### 2.  Regulation Designed to Control Secondary Effects of Speech

Consistent with its intended purpose to address a public safety concern, the Slidell ordinance does not regulate the content of the panhandler's speech but is designed to address the negative secondary effects of panhandling, namely, the dangerous behavior associated with aggressive begging and impeding of local business.  The United States Supreme Court has upheld alleged regulations of speech on the basis that a government has the authority to regulate the secondary effects of speech. In *City of Renton v.  Playtime Theatres, Inc.*, 475 U.S. 41 (1986), the Court analyzed whether a zoning ordinance limiting the area where an adult movie theater could be located was an unconstitutional restriction of speech.   Specifically, the

---

[30] *Id.* at Exhibit C.
[31] *See* Exhibit 5-B. This number becomes even less significant when it is noted that 5 of the 14 known offenders were repeat offenders.

ordinance at issue prohibited the operation of an adult movie theater within 1,000 feet of any residential zone, single or multiple family dwelling, church, park, or school.  *Id.* at 43.

The Court first noted that the zoning ordinance did not outright prohibit the operation of adult movie theaters within the city.  *Id.* at 46.  Further, the Court found that the ordinance was "aimed not at the *content* of the films shown at 'adult motion picture theatres,' but rather at the *secondary effects* of such theaters on the surrounding community."  *Id.* at 47.  The zoning ordinance focused on the following secondary effects of an adult movie theater's operation, including, "to prevent crime, protect the city's retail trade, maintain property values, and general 'protec[t] and preserv[e] the quality of [the city's] neighborhoods, commercial districts, and the quality of urban life,' not to suppress the expression of unpopular views." *Id.* at 48.  The *Renton* Court eventually upheld the zoning ordinance using an intermediate level of scrutiny, in part due to the city's content-neutral motivation in enacting the ordinance at issue.[32]

This case provides concrete examples of governmental interests that support an alleged restriction of speech that is completely unrelated to the content of that speech.  Like the municipality in *Renton*, Slidell has enacted an ordinance to address the negative secondary effects of a panhandler's free speech.  As indicated by the extensive complaints described in the foregoing section, there is a great concern about public safety among the citizenry and fear among business owners and/or their employees that excessive panhandling may hamper local business.[33]  Both public safety and the promotion of local commerce are compelling government interests completely apart from the substance of a panhandler's expressive communication.

The relevance of *Renton* in light of the *Reed* clarification on content-neutrality has been addressed in part by the Fifth Circuit.   While it has not been directly discussed in a majority

---

[32] *See* Exhibit C to Exhibit 6.

opinion issued by the Fifth Circuit, Judge Edith Jones applied the clarified *Reed* analysis in a dissenting opinion in the context of a government regulation that required prepublication of technical information related to firearms. *See Defense Distributed v. United States Dep't of State*, 838 F.3d 451 (5th Cir. 2014) (Jones, dissenting). Judge Jones found that this prepublication review was content-based because it regulated a specific topic.   Further, she was unpersuaded by the government's argument that its regulation was content-neutral on the grounds that it regulated the "harmful secondary effects" of the proposed speech rather than the speech itself. She specifically noted: "[s]econdary effects of speech, as the Court understood, include 'congestion, [ ] interference with ingress of egress, [ ] visual clutter, or [ ] the need to protect the security of embassies', which are the kind of regulations that underlie *Renton v. Playtime Theaters*. (citation omitted) [T]he regulation of speech here is focused on the 'direct impact of speech on its audience' because the government seeks to prevent certain listeners – foreign nationals – from using the speech about firearms to create guns." *Id.* at 470.

Like the municipality in *Renton* and in marked contrast to the federal government in *Defense Distributed*, the Defendants have not enacted an ordinance to address the direct impact of the panhandler's speech.  For example, many people are annoyed by panhandling, whether it occurs in the medians while stopped at a traffic light or outside a convenience store.  Had the Defendants wished to limit the citizens' annoyance at such speech (*i.e.*, the direct impact of the speech on its intended audience),  it would have prohibited panhandling as matter of course or restricted the areas in which panhandling may occur.   Instead, the statute was clearly enacted to address the negative secondary effects of panhandling, namely to remedy public safety concerns associated with panhandling, as indicated by the complete lack of government oversight into the content of the panhandler's speech.

In short, it is clear that Slidell was motivated to enact this statute to address a growing public concern over panhandling that is well documented and supported by Slidell police records.

## V.    ORDINANCE IS NARROWLY TAILORED

The Slidell ordinance is narrowly tailored to further the compelling need of public safety while imposing only a minimal restriction on the exercise of a panhandler's First Amendment rights.   "To meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interest, not simply that the chosen route is easier." *McCullen v. Coakley*, 134 S. Ct. 2518, 2540 (2014).   The Slidell ordinance sets up a simple permit scheme, which is granted as a matter of course.  In fact, the only reasons for which an applicant would be denied a permit, *i.e.* criminal convictions for aggressive panhandling or a violent crime, are directly related to the government's need in passing the statute – public safety.

What this ordinance really boils down to is that panhandlers are required to wear what amounts to a nametag, a common experience in both social settings and the work place.   This nametag in no way restricts a panhandler's ability to express themselves.   Instead of restricting First Amendment rights, this requirement is specifically tailored to remedy the exact situation discussed in the foregoing section about compelling government interest in this statute, namely the inability to identify panhandlers who are the subject of a complaint.    This nametag requirement remedies the situation in which a person is engaged in panhandling but refuses to leave after being requested, is obstructing traffic, or has become overly aggressive and flees the scene once a police complaint has been made – an extremely common situation that becomes

painfully obvious upon a review of the extensive Slidell police records included with this motion.

As indicated by the increased number of complaints without any identifying information for the panhandler, the police are unable to address the public safety concerns of the citizens of Slidell under existing ordinances. The Slidell ordinance is intended to remedy this public safety concern while imposing only the slightest restriction on the panhandler's alleged First Amendment rights.

## VI.     ORDINANCE IS A REASONABLE PERMIT PROCESS

The Plaintiffs seek to paint the simple permit scheme imposed by the Slidell ordinance as a heavy handed governmental interference that restrains a panhandler's First Amendment rights. Instead, the Slidell ordinance is a reasonable permit scheme that does not impose any content restrictions on the expression of the panhandler and is not subject to unbridled review by the government.  Accordingly, the Slidell ordinance should be upheld by this Court.

### 1.   Panhandling Permit Not Subject to Discretion of Government Authority

In both of their complaints, the Plaintiffs have alleged that the permitting scheme of the Slidell ordinance is an unconstitutional constraint.[34]  However, the Slidell ordinance does not impose traditional prior restraint tactics by a Court like a gag order or injunction but establishes a common permit scheme.  Permit schemes have generally been upheld if permits are not based on the subjective discretion of a government authority.

In *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 753 (1987), a newspaper brought suit against a municipality over an ordinance that gave the mayor "authority to grant or deny application for annual newsrack permits."   The statute at issue in this case did not contain any limits on the mayor's authority to either deny or grant the permit.   The Supreme

---

[34] *See* Rec. Doc. 1.

Court noted that there was a significant concern about censorship when a "licensing statute plac[es] unbridled discretion in the hands of a government official or agency." *Id.* at 757. Rather, any licensing scheme should contain explicit limits that are made evident by "textual incorporation, binding judicial or administrative construction, or well-established practice." *Id.* at 770. The Court held that the statute at issue failed to articulate any defined standards for the exercise of discretion and therefore was an unconstitutional restraint on the plaintiff's First Amendment rights.

More recently, *Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123 (1992) provides even more insight into what factors are considered in determining the limits of government authority in granting or denying a permit. In that particular case, the Court was faced with the question of whether a parade ordinance that authorized a government official to vary a required parade fee violated the plaintiff's First Amendment right to assemble. In analyzing the ordinance at issue, the Court found that there were several noticeable deficiencies in the statute, namely the absence of any definite standards for fee determination:

> The decision how much to charge for police protection or administrative time—or even whether to charge at all—is left to the whim of the administrator. There are no articulated standards either in the ordinance or in the county's established practice. The administrator is not required to rely on any objective factors. He need not provide any explanation for his decision, and that decision in unreviewable. *Id.* at 2403.

*See also Toga Sec. v. Lee*, 323 F. Supp. 2d 779 (E.D. La. 2004) (finding statute imposing variable fee on parade applicants was unconstitutional).

In marked contrast to the ordinances in both *City of Lakewood* and *Forsyth County*, the Slidell ordinance contains a mandate that a permit must be granted unless very specific conditions are met, all of which are narrowly tailored to further Slidell's compelling government interest in public safety. First, the Slidell ordinance requires that the police issue the temporary

permit as a matter of course, as well as the year permit (provided the plaintiff passes the background check).  Second, there are objective factors that indicate when a permit may be denied; these factors are examined using the criminal history of the panhandling applicant. There is absolutely no discretionary element to the potential denial of a panhandling permit.  For example, the government authority could not deny a permit on the grounds that he or she personally disagrees with panhandling, which would be tantamount to censorship of the panhandler's speech.  Additionally, as an even further check on the discretion of the government, a panhandler who has been denied a permit is allowed a review process, either through the chief administrative officer of Slidell or the police chief.  It is abundantly clear that the licensing scheme laid out by the Slidell ordinance is not left to the unbridled discretion of a government authority.

Furthermore, it is evident that the permit scheme proposed by the Slidell ordinance is not just a backdoor form of censorship.  As a result, the Slidell ordinance can be likened to the tour guide licensing scheme examined in *Kagan v. City of New Orleans*, 957 F. Supp. 2d 774, 778 (E.D. La. 2013).  In *Kagan*, a number of tour guides alleged that a licensing scheme implemented by the City of New Orleans violated their First Amendment rights.  The licensing scheme required tour guides to pay a $50 fee, pass a written test, as well as submit to drug testing and a background check.  In determining whether the licensing scheme was content-neutral or content-based,[35] the court first noted that the statute at issue applied to the act of conducting a tour of the city, rather than the actual speech of the tour guide.  *Id.* at 777.  Additionally, the court stated a content-based regulation can be determined "when it creates a 'substantial risk of

---

[35] This case was decided prior to the United States Supreme Court's decision in *Reed*.  In light of the current Fifth Circuit precedent of time, the court used governmental intent to determine, at least in part, whether the licensing scheme at issue was content-based or content-neutral, rather than the facial test articulated by *Reed*.

eliminating certain ideas or viewpoints' from the public forum." *Id.* at 778 (citing *Serv. Empls. Int'l Union Local 5 v. City of Houston*, 595 F.3d 588, 596 (5th Cir. 2010)).

However, the court stated the following while describing the impact of the licensing scheme on the speech of the tour guides:

> [W]hile the licensing scheme does, in operation, 'refer[] to the content of expression' because it applies only when persons conduct others for hire and 'giv[e] any type of historical background on certain sites,' it clearly was not enacted to suppress 'expression due to a disagreement with the message conveyed or a concern over the message's direct effect on those who are exposed to it. (citation omitted) It was, instead enacted to protect the City's tourism industry by protecting the safety of tour group participants and reducing the chance they will be swindled...A tour guide may say whatever he or she wishes about a site, or anything else of that matter – the City does not regulate the content of tour guides' speech. *Id.* at 778-79.

Like the licensing scheme in *Kagan*, the Slidell ordinance refers to the speech in order to identify the applicability of the statute without regulating the speech involved in panhandling. The Slidell ordinance guarantees no censorship of the expressive content of the panhandler by not vesting any discretion in the granting government authority.

In conclusion, there is absolutely no censorship, or any other assertion of control, over the actual content of the panhandler's speech by Slidell. This lack of content censorship underscores the fact that the Slidell ordinance is strictly a measure designed to promote public safety in a light of a history of reported problems with this type of particular behavior.

## 2. Non-Discretionary Permit Subject to Intermediate Level of Scrutiny

As demonstrated in the foregoing section, the Slidell ordinance is able to withstand even strict scrutiny. However, in light of the Supreme Court's recognition that charitable solicitation is given some protection under the First Amendment, some district courts have analyzed permitting schemes regulating door to door solicitation "that neither specif[y] grounds for denying a permit nor confer[] discretion on municipal officials to do so [are] merely a time,

place, and manner restriction that [are] subject to a lesser degree of scrutiny." *Assoc. of Community Organizations for Reform Now v. Town of East Greenwich*, 453 F. Supp. 2d 394, 405 (D. R.I. 2006).

Under this analysis, the permitting scheme outlined by the Slidell ordinance is subject to a lesser, intermediate degree of scrutiny that considers two elements: (1) whether the regulation at issue "serves a sufficiently strong, subordinating interest that the [municipality] is entitled to protect" and (2) whether the regulation is "narrowly drawn [and] designed to serve those interests without unnecessarily interfering with First Amendment freedoms." *Village of Schaumburg*, 444 U.S. at 637 (citing *Hynes v. Mayor of Oradell*, 425 U.S. 610, 620 (1976) and *First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765, 786 (1978)).

For much the same reasons that the Slidell ordinance passes even strict scrutiny, it would easily survive an intermediate scrutiny analysis.  As with strict scrutiny, Slidell's interest in passing the statute is public safety in light of an increased number of panhandling complaints in recent years.  Second, it is narrowly drawn to address those circumstances in which the Slidell police are unable to make an arrest simply because the panhandler cannot be identified.  It imposes no restriction on the expressive content of the panhandler.

In short, the Slidell ordinance is a reasonable licensing scheme that contains objective standards and grants permits as a matter of course, rather than being subject to the unbridled discretion of a government official.

## VII.    CONCLUSION

In conclusion, the Slidell ordinance does not burden a panhandler's First Amendment rights.  It is an ordinance aimed at protecting the public safety of the City of Slidell and should be upheld.

Respectfully submitted,

**COTTEN SCHMIDT & ABBOTT, LLP**

*/s/ Lawrence E. Abbott*
**LAWRENCE E. ABBOTT (Bar No. 2276)**
**SARAH P. REID (Bar No. 33311)**
**650 Poydras Street, Suite 2810**
**New Orleans, Louisiana 70130**
**Telephone:  (504) 568-9393**
**Facsimile:  (504) 524-1933**

**COUNSEL FOR DEFENDANTS,**
**CITY OF SLIDELL, FREDDY DRENNAN,**
**AND EUGENE HOWARD**

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of April, 2017, I served a copy of the foregoing to all known counsel of record via the court's CM/ECF system.

*/s/ Lawrence E. Abbott*
**LAWRENCE E. ABBOTT**