# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**GARY BLITCH ET AL.**                                      CIVIL ACTION

**VERSUS**                                                   No. 16-17596

**CITY OF SLIDELL ET AL.**                                   SECTION I

## ORDER AND REASONS

Slidell requires would-be panhandlers to register with the chief of police and wear identification before asking their fellow citizens for money. Because that offends the United States Constitution, the Court grants plaintiffs' motion[1] for summary judgment, denies Slidell's,[2] and issues a permanent injunction against enforcement of the ordinance.

## I.

Since 2015, the City of Slidell has received seventy complaints relating to panhandling or solicitation-based offenses. Yet, only fourteen of those complaints were connected to an identifiable individual. That means that, over the last two years, the Slidell police have been faced with fifty-six complaints without knowing which individual the complaint concerned.

Slidell argues that those fifty-six incidents substantiate that panhandling is increasing in Slidell and that the City is powerless to enforce its current laws against aggressive panhandling because the City does not know who is panhandling. As a

---

[1] R. Doc. No. 29.
[2] R. Doc. No. 30.

result, the City Council took action and passed a civic ordinance requiring all panhandlers and beggars to obtain a panhandling permit from the Slidell police before begging. That way, Slidell suggests, the City will know who is panhandling. (For simplicity's sake, this Court will generally reference only "panhandlers" and "panhandling" even though Slidell's ordinance refers to both panhandling and begging. *See also* Slidell City Code § 11-207.1(b) ("*Beg, begging* or *panhandling* shall be synonymous and shall mean asking for money or objects of value, with the intention that the money or object be transferred at that time, and at that place.").)

The first version of the ordinance required a prospective panhandler to complete a written application at least forty-eight hours before the first full day of panhandling. Plaintiffs—three indigent individuals who panhandle on the public streets and sidewalks of Slidell (R. Doc. No. 27, ¶¶ 25-26)—filed this suit after the ordinance's passage. The complaint alleged that a forty-eight hour prior restraint on a specific type of speech violated the First Amendment (as incorporated by the Fourteenth Amendment). Plaintiffs asked for a preliminary injunction to block the ordinance from being enforced.

The City then had second thoughts after plaintiffs' request for emergency relief. It returned to the drawing board and passed a revised ordinance. The revised panhandling ordinance, which will generally be referred to as the "panhandling ordinance," is the ordinance presently at issue here. The new panhandling ordinance deleted the forty-eight hour waiting period for a permit (at least on weekdays during business hours—more on that later). But even under the revised ordinance it

remains "unlawful for any person to beg or panhandle within the city limits without first obtaining a permit from the chief of police or his designee." Slidell City Code § 11-207(a). And getting that permit is not necessarily simple: the revised panhandling ordinance requires a two-part application process for anyone intending to panhandle.

At the first stage, a potential panhandler needs to go to the police department between 9:00 A.M. and 5:00 P.M. on a weekday. *Id.* § 11-207(b)(1). (If a prospective panhandler decides that they want to start begging on a weekend, they have to wait until the following Monday at 9:00 A.M. to apply for a permit.) Once at the police station, the prospective panhandler needs to fill out an application listing his or her (1) address, (2) telephone numbers, (3) email addresses, and (4) "any other information needed to establish the applicant's identity." *Id.* § 11-207(b)(1). (The ordinance does not explain what happens if, for example, a homeless individual does not have a home or contact information). In addition, an applicant must "also provide picture identification at the time the application is submitted, or, if picture identification is impractical . . . other documentation that definitively establishes identity." *Id.* § 11-207(b)(1).

The Slidell police "shall" immediately grant the prospective panhandler a temporary panhandling permit when the application is completed. *Id.* § 11-207(b)(1). That permit grants permission to panhandle for seventy-two hours. *Id.* § 11-207(b)(1).

Once the seventy-two hour period expires, the panhandler has to return again to the police station. *Id.* § 11-207(b)(2). On the second visit, the chief of police "shall" grant the panhandler a one-year panhandling permit "unless":

- The application includes a false or fraudulent statement;

- The applicant has been convicted of violating begging or panhandling ordinances within the prior twelve months;

- The applicant has two or more violations of the Slidell criminal code within the prior five years;

- The applicant has been convicted of two or more offenses involving an assault, communicating a threat, illegal use of a weapon or other act of violence—whether a misdemeanor or felony—within the prior five years; or

- The applicant has been convicted of one or more homicides in the prior twenty years.

*Id.* § 11-207(b)(2)(i)-(v).

The restrictions do not end there. Slidell's ordinance also regulates *how* individuals can panhandle. In particular, the ordinance requires that panhandlers "must keep" the permit "displayed on his or her chest" when "begging or panhandling alms for personal gains." *Id.* § 11-207(f). The ordinance further specifies that the permit must be "hanging from a lanyard" or "clipped to" the panhandler's "garment." *Id.* § 11-207(f). The "name, type of permit[,] and date of expiration" must remain "visible at all times." *Id.* § 11-207(f). The panhandler must show the permit "to any law enforcement officer or the chief administrative officer or his designee

immediately upon request." *Id.* § 11-207(f). Should the panhandler be convicted of a violation of the Slidell's "begging and panhandling ordinances," the panhandler's permit is invalidated. *Id.* § 11-207(d). Violations of the panhandling ordinance are also punishable by up to six months in prison and/or a fine of $1,000. *Id.* § 1-12.

A would-be-panhandler may appeal both denials and revocations of their panhandling permit. The appeal is due within ten days of the denial and/or revocation. Permit denials are appealed to Slidell's chief administrative officer; permit revocations are appealed to the chief of police. *Id.* § 11-207(c),(e).

After Slidell revised the panhandling ordinance, plaintiffs amended their complaint to allege that the revised ordinance was equally unconstitutional. Slidell agreed not to enforce the ordinance pending this Court's final judgment. The parties have now filed cross-motions for summary judgment.

## II.

Summary judgment is proper when, after reviewing the pleadings, the discovery and disclosure materials on file, and any affidavits, the court determines that there is no genuine dispute of material fact. *See* Fed. R. Civ. P. 56. "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the party seeking summary judgment carries its burden pursuant to Rule 56, the nonmoving party must come forward with specific facts showing that there is

a genuine dispute of material fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The showing of a genuine issue is not satisfied by creating "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). Instead, a genuine issue of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party responding to the motion for summary judgment may not rest upon the pleadings, but must identify specific facts that establish a genuine issue. *Id.* The nonmoving party's evidence, however, "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor." *Id.* at 255; *see also Hunt v. Cromartie*, 526 U.S. 541, 552 (1999).

### III.

This Court must first satisfy itself that it has jurisdiction before turning to the merits. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93-102 (1988). Article III limits this Court's jurisdiction to actual cases and controversies. A central component of that requirement is that a federal court may consider only "ripe" cases. *See Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 807-08 (2003).

The ripeness doctrine protects both the courts and the political branches by avoiding the twin dangers of (1) "premature" adjudications that entangle the courts in "abstract disagreements over . . . policies" and (2) "judicial interference" in policy decisions until a policy "has been formalized and its effects felt in a concrete way by

the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977).

A case becomes ripe for determination when the "harm asserted has matured sufficiently to warrant judicial intervention." *Contender Farms, L.L.P. v. U.S. Dep't of Agriculture*, 779 F.3d 258, 267 (5th Cir. 2015) (internal quotation marks). Slidell is not presently enforcing its panhandling ordinance. Therefore, though neither party raises the issue, one could question whether this case is ripe. After all, the panhandling ordinance is not, in fact, currently preventing the plaintiffs from panhandling in Slidell. Nonetheless, the Court concludes that this case is ripe for adjudication.

Only *after* plaintiffs filed suit and moved for a preliminary injunction did the City agree to not enforce the panhandling ordinance. *See* R. Doc. No. 10 (noting the City's agreement to avoid the need for the motion for a preliminary injunction by voluntarily agreeing not to enforce the ordinance). So the suit was ripe when it is was filed. *Cf. Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2342 (2014) ("[A]n actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging [a] law."); *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988) ("[T]he alleged danger of this statute is, in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution."). What the Court is really facing here is a *mootness* question—*i.e.*, does the City's voluntary cessation of allegedly illegal conduct moot the case—masquerading as a ripeness question.

That is easy: "voluntary compliance" moots a case only when "it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000). Slidell has agreed only to not enforce its panhandling ordinance pending this Court's ruling on its constitutionality. Thus, the allegedly wrongful behavior can be expected to recur and the City's voluntary enforcement cessation during the pendency of this case does not render the matter nonjusticiable.

But even if we leave aside that Slidell only foreswore enforcement after suit was filed and focus solely on the ripeness inquiry, this matter still meets all the prerequisites for a pre-enforcement challenge. The "key considerations" in evaluating ripeness "are the *fitness* of the issue for judicial decision and the *hardship* to the parties of withholding court consideration." *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 545 (5th Cir. 2008) (emphasis added) (internal quotation marks omitted). Under that test, a "case is generally ripe if any remaining questions are purely legal ones; conversely, a case is not ripe if further factual development is required." *Id.*

This case is fit for decision. The Court will neither "benefit from any further factual development" nor will it be in a "better position to adjudicate the issues in the future than it is now." *Pearson v. Holder*, 624 F.3d 682, 684 (5th Cir. 2010) (internal quotation marks omitted). The case presents a legal question: is there a legally sufficient basis for Slidell to place a burden on plaintiffs' First Amendment rights? That question may be decided on the present record. All antecedent factual issues—

*e.g.*, the prevalence of aggressive panhandling and its secondary effects in Slidell—are already known.

The hardship analysis is no more difficult. Plaintiffs presumably depend on panhandling to support themselves. Requiring them to wait for a post-enforcement challenge would force them "to choose one of two undesirable options." *Texas v. United States*, 497 F.3d 491, 499 (5th Cir. 2007). Absent a pre-enforcement challenge, plaintiffs will have to either (1) comply with a permitting ordinance that they allege violates the First Amendment, or (2) violate the ordinance and risk jail time and a fine, as well as having their right to obtain a permit stripped away for at least a year. *See* Slidell City Code § 1-12; *id.* § 11-207(b)(ii), (d). That constitutes a legally cognizable hardship. *Cf. Oh. Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 734 (1998) (finding no hardship because, among other things, the challenged agency action did not "force [plaintiff] to modify its behavior . . . to avoid future adverse consequences").

This matter is justiciable regardless of whether the potential justiciability challenge is characterized as one of ripeness or mootness.

## IV.

The threshold merits issue is whether plaintiffs' desire to ask for charity is even protected by the First Amendment. Plaintiffs argue that it is. Slidell, without affirmatively taking a contrary position, implies that it is not.

The Supreme Court has said that "charitable appeals for funds, on the street . . . involve[s] a variety of speech interests" such as, for example, the

"communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes." *Vill. of Schaumberg v. Citizens for a Better Env't*, 444 U.S. 620, 632 (1980). Thus, not only does charitable solicitation (by organized charities, at least) involve "interests protected by the First Amendment's guarantee of freedom of speech," *id.* at 629, but also that protection goes beyond the constitutional protections accorded to "purely commercial speech," *id.* at 632. That is because an economic motive for speaking does not obviate the protections of the First Amendment, *see, e.g.*, *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011); *Serafine v. Branaman*, 810 F.3d 354, 356 (5th Cir. 2016), and charitable solicitation "does more than inform private economic decisions" as it is "not primarily concerned with providing information about the characteristics and costs of goods and services," *Schaumberg*, 444 U.S. at 632.

*Schaumberg* recognizes that the solicitation of funds by charitable organizations is protected by the First Amendment. That holding compels the conclusion that the First Amendment also protects an individual's right to ask for charity. For the contrary proposition to be true, Slidell would have to establish that *only* charitable *organizations* have a First Amendment right to ask for charity.

The Court declines to stake out such a position. The distinction between an individual asking for charity and an organization asking for charity should not be "a significant one for First Amendment purposes." *Loper v. N.Y.C. Police Dep't*, 999 F.2d 699, 704 (2d Cir. 1993); *see, e.g.*, *Speet v. Schuette*, 726 F.3d 867, 875-78 (6th Cir. 2013); *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 533 (4th Cir. 2013),

*abrogated on other grounds by Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2228-29 (2015); *Gresham v. Peterson*, 225 F.3d 899, 904 (7th Cir. 2000); *Champion v. Kentucky*, ___ S.W.3d ___, 2017 WL 636420, at *2 (Ky. 2017); *City of Lakewood v. Willis*, 375 P.3d 1056, 1059 (Wash. 2016) (en banc). After all, First Amendment cases regularly reject the idea that the existence of an individual right to speak somehow permits limitations on an organization's right to speak. *See, e.g.*, *Catholic Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 430 (5th Cir. 2014). As such, the availability of an organizational outlet for speech should not shield individual restrictions on speech from First Amendment scrutiny. *Cf. Pac. Gas & Elec. Co. v. Pub. Util. Comm'n of Cal.*, 475 U.S. 1, 8 (1986) (plurality opinion) ("The identity of the speaker is not decisive in determining whether speech is protected. Corporations and other associations, like individuals, contribute to the discussion, debate, and the dissemination of information and ideas that the First Amendment seeks to foster." (internal quotation marks omitted)). Plaintiffs have a First Amendment right to panhandle in Slidell.

## V.

Not all governmental impositions on protected speech are unconstitutional. *See, e.g.*, *Williams-Yulee v. Fla. Bar*, 135 S. Ct. 1656, 1673 (2015). Thus, the conclusion that panhandling is a protected activity under the First Amendment is only the first step in determining the constitutionality of Slidell's panhandling ordinance. Now the Court must determine the appropriate level of constitutional

scrutiny to apply and determine whether the ordinance's permitting regime survives such scrutiny.

### A.

"[B]efore evaluating the merits of the Plaintiffs' challenge[]," the Court "must be careful to properly define [its] scope because facial and as-applied challenges have different substantive requirements." *Catholic Leadership*, 764 F.3d at 425. Plaintiffs' briefing is ambiguous as to the exact nature of the challenge they raise. The briefing states that the plaintiffs are bringing an overbreadth challenge; it is more ambiguous as to whether the plaintiffs are *also* bringing an as-applied challenge. In response to an inquiry from the Court, the plaintiffs clarified that they are pursuing only a facial overbreadth challenge. *See* R. Doc. No. 40.

Therefore, the Court proceeds directly to the overbreadth inquiry. *See Serafine*, 810 F.3d at 364 ("By electing not to press an as-applied challenge . . . [plaintiff] clears the way for us to consider her overbreadth challenge."). To prevail in an overbreadth challenge, the plaintiffs must show that "a substantial number of" the panhandling ordinance's "applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (internal quotation marks omitted).

### B.

To start the overbreadth analysis, the court begins by construing the challenged statute. *See id.* at 474. Here, the panhandling ordinance makes it "unlawful for any person to beg or panhandle within the city limits without first

obtaining a permit from the chief of police or his designee." Slidell City Code § 11-207(a). The Court reads that provision in accordance within its ordinary and natural meaning: anyone panhandling within the city limits of Slidell needs to obtain a police permit before doing so.

Because the ordinance applies throughout the city limits of Slidell, the Court cannot apply one single level of scrutiny to determine the constitutionality of the ordinance in all situations. Instead, the applicable level of scrutiny varies depending on the location in Slidell where plaintiffs wish to panhandle. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45-46 (1983). The Court will begin by determining the constitutionality of the panhandling ordinance insofar as it requires prospective panhandlers to obtain a permit before panhandling in a public forum— *i.e.*, the public streets and sidewalks that "facilitate the daily commerce and life of" Slidell. *United States v. Kokinda*, 497 U.S. 720, 728 (1990) (plurality opinion).

## C.

The appropriate level of constitutional scrutiny as to that inquiry turns on whether Slidell's ordinance is deemed to be a content-based or a content-neutral regulation. If the ordinance is a content-neutral regulation on First Amendment protected activity in a public forum, then Slidell must merely show that the ordinance is a reasonable time, place, or manner restriction. If, on the other hand, the regulation discriminates on the basis of content or viewpoint, then Slidell has to demonstrate that the ordinance survives strict scrutiny. *See, e.g.*, *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 469 (2009).

For most of our recent constitutional history, the content-neutrality inquiry focused on "whether the government . . . adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). When a regulation "burden[ed] speech *because of its content*," *United States v. Playboy Entm't Grp, Inc.*, 529 U.S. 803, 815 (2000) (emphasis added), the courts applied strict scrutiny, *see Boos v. Barry*, 485 U.S. 312, 321-22 (1988); *Carey v. Brown*, 447 U.S. 455, 470-71 (1980); *Police Dep't of the City of Chi. v. Mosley*, 408 U.S. 92, 99-102 (1972). By contrast, when a regulation could be "justified without reference to the content of the regulated speech," *Ward*, 491 U.S. at 791—for example, the harmful secondary effects of seedy adult theaters or loud rock concerts—the courts examined whether the regulation was a reasonable time, place, and manner restriction, *see, e.g.*, *id.*; *City of Renton v. Playtime Theaters, Inc.*, 475 U.S. 41, 48-50 (1986); *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984).

That approach had the unintentional effect of turning First Amendment litigation into a sport. Courts do not generally scrutinize the legislative record for evidence of an improper motive when the government can advance an otherwise acceptable justification for legislation. *See United States v. O'Brien*, 391 U.S. 367, 383 (1968); *see, e.g.*, *City of Erie v. Pap's A.M.*, 529 U.S. 277, 292 (2000) (plurality). So provided that governmental officials could say the right magic words in court— *i.e.*, this ordinance is being passed "to combat harmful secondary effects"—the regulation would be analyzed as a time, place, or manner restriction. *See BBL, Inc. v. City of Angola*, 809 F.3d 317, 326 (7th Cir. 2015) (Sykes, J.).

*Reed v. Town of Gilbert* then worked a sea change in First Amendment law. *Reed* instructs that the prior focus on a regulation's justification "skips the crucial first step in the content-neutrality analysis." 135 S. Ct. 2218, 2228 (2015). Now, under *Reed*, courts apply a two-step framework when determining content neutrality.

At the first stage of the inquiry, a court must determine whether a law is content neutral on its face. *See id.* To do so, the court asks whether the "law applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* at 2227. A law can do so by either "defining regulated speech by particular subject matter" or "defining regulated speech by its function or purpose." *Id.* If a law is not content neutral on its face, then the law is subject to strict scrutiny regardless of the proffered legislative motive. *See id.* at 2227-28. A court need not "consider the government's justifications or purposes . . . to determine whether" a facially content-based regulation of speech "is subject to strict scrutiny." *Id.* at 2227

Only after determining that a law is content neutral on its face does a court perform the familiar inquiry into the regulation's justification. *See id.* If a law "cannot be justified without reference to the content of the regulated speech," then it is subject to strict scrutiny. *Id.* (internal quotation marks omitted).

### D.

The Slidell panhandling ordinance is not content neutral on its face. Only speakers that wish to "beg or panhandle" need to obtain "a permit from the chief of police or his designee." Slidell City Code § 11-207(a). So only speakers that wish to raise a particular topic of speech on the streets of Slidell—a request for assistance,

and even then a particular type of request for assistance—need to obtain a police permit before speaking. That regulates speech both by its subject matter and by its purpose. *Reed* therefore mandates strict scrutiny. *See* 135 S. Ct. at 2227-28; *see also Norton v. City of Springfield, Ill.*, 806 F.3d 411, 412-13 (7th Cir. 2015) (Easterbrook, J.) (explaining that anti-panhandling ordinance had to survive strict scrutiny).

That result does not change because some panhandling activities—*e.g.*, standing on a street corner shaking a cup—might be better characterized as expressive conduct rather than pure speech. Though content-neutral restrictions on expressive conduct are examined under intermediate scrutiny, *see O'Brien*, 391 U.S. at 376-77, restrictions on expressive conduct that are not content neutral on their face remain subject to strict scrutiny, *see Reed*, 135 S. Ct. at 2228 (noting that consideration of a law's purpose in expressive conduct cases such as *O'Brien* and *Community for Creative Non-Violence* comes only after consideration of whether the law is content neutral on its face). Regardless of whether panhandling is characterized as speech or expressive conduct, the panhandling ordinance is subject to strict scrutiny because, on its face, it burdens speech and/or conduct by its subject matter and by its purpose.

Slidell offers three main counter-arguments in support of its position that strict scrutiny does not apply. None succeed.

First, Slidell attempts to distinguish post-*Reed* decisions applying strict scrutiny to anti-panhandling ordinances, *see, e.g.*, *Norton*, 806 F.3d at 412-13; *Homeless Helping Homeless, Inc. v. City of Tampa, Fla.*, No. 15-1219, 2016 WL

4162882, at *4-5 (M.D. Fla. 2016); *Browne v. City of Grand Junction, Colo.*, 136 F. Supp. 3d 1276, 1288-94 (D. Colo. 2015), by noting that Slidell is merely regulating panhandling—not banning it entirely. But "[i]t is of no moment that" Slidell "does not impose a complete prohibition" on panhandling. *Playboy Entm't Grp, Inc.*, 529 U.S. at 812. Slidell "may no more silence unwanted speech by burdening its utterance than by censoring its content." *Sorrell*, 564 U.S. at 566. So Slidell's protestation that it is not acting as a censor is irrelevant to the question of whether strict scrutiny applies. Slidell's "content-based burdens must satisfy the same rigorous scrutiny as . . . content-based bans." *Playboy Entm't Grp, Inc.*, 529 U.S. at 812.

Second, Slidell argues that strict scrutiny does not apply because Slidell passed the ordinance to address the harmful secondary effects of panhandling—not to suppress speech. *See, e.g.*, *Kagan v. City of New Orleans, La.*, 753 F.3d 560, 561-62 (5th Cir. 2014) (applying intermediate scrutiny when regulation could be "justified without reference to content or speech"). But this Court need not engage in the same analysis of Slidell's motives here because "an innocuous justification cannot transform a facially content-based law into one that is content neutral." *Reed*, 135 S. Ct. at 2228; *see also id.* at 2229 ("Innocent motives do not eliminate the danger of censorship presented by a facially content-based statute . . . ."). Even if this Court were to assume for the sake of argument that Slidell did not pass its law to silence panhandlers, *Reed* still mandates strict scrutiny. *See, e.g.*, *Free Speech Coalition, Inc. v. Att'y Gen. of U.S.*, 825 F.3d 149, 163 (3d Cir. 2016) ("To allow the secondary effects doctrine to transform a facially content-based law into a content-neutral one any time

the Government can point to a laudable purpose behind the regulation that is unrelated to protected speech would render *Reed* a nullity.").

Finally, Slidell suggests that *Schaumberg* permits cities to impose "reasonable regulation[s]" on solicitation, 444 U.S. at 632, and that the Slidell City Code is an archetypical example of such a reasonable time, place, or manner restriction. Slidell's argument is based on the intersection between the panhandling ordinance (Slidell City Code § 11-207) and Slidell's broader solicitation and peddling regulations (*id.* §§ 20-2, 20-4, 20-8). Slidell suggests that the City Code is content neutral toward all solicitors, panhandlers, and peddlers on the streets of Slidell, and therefore only intermediate scrutiny should apply to the panhandling ordinance.

Slidell can only find shelter in time, place, or manner analysis if the City Code truly is content-neutral on its face. *See Reed*, 135 S. Ct. at 2233 (Alito, J., concurring) (noting that a municipality may pass reasonable content-neutral restrictions on signage, but content-based restrictions must survive strict scrutiny). Nonetheless, a close reading of the Slidell City Code demonstrates that Slidell actually imposes unique burdens on panhandlers (when compared to all other speakers). As such, time, place, or manner analysis remains inappropriate.

Slidell requires most, but not all, persons engaging in solicitation, peddling, and panhandling to register with the City before engaging in either activity. (The City Code primarily distinguishes solicitors from peddlers based on whether they are immediately delivering the products they sell: peddlers deliver immediately, while

solicitors deliver in the future. *See id.* § 20-2.) The solicitation and peddling regulations require, as a starting point, that:

> Except as otherwise provided . . ., no person shall conduct business within this jurisdiction as a peddler or solicitor, without first obtaining a *city license*.

*Id.* § 20-4(a) (emphasis added).

So far, so good. But Section 20-4(a)'s general rule that peddlers and solicitors must get the City's prior permission is subject to a number of exceptions. For example, Slidell does not require "any person going from house-to-house, door-to-door, business-to-business, street-to-street or any other type of place-to-place movement" to obtain a license when the "primary purpose" of doing so is to exercise "that person's state or federal constitutional rights such as the freedom of speech, freedom of the press, freedom of religion, and the like." *Id.* § 20-4(g)(2).

Further, "solicitors" (as opposed to peddlers) are entirely exempt from the licensing requirements. Solicitors are merely required to *register* with the City before soliciting. *See id.* § 20-4(a) ("Solicitors need not be licensed but are required to register with the city pursuant to section 20-8."). To register, the prospective solicitor fills out the appropriate form with the City finance department. *See id.* § 20-8(a). Upon completion, "the finance department shall issue" the solicitor "a certificate of registration as proof of the registration." *Id.*

There is an exception to that registration requirement, however. A non-commercial door-to-door advocate—"[a] person who goes door-to-door for the primary purpose of disseminating religious, political, social or other ideological beliefs," *id.* § 20-2, is not required to register with the City, *id.* § 20-8(b).

The net-net is that the content of a speaker's message determines the appropriate regulatory regime under the Slidell City Code. For example, an individual does not need to register with the police to stand on the sidewalks of Slidell and ask someone to "think of the poor." The same is true if an individual wants to tell someone to "think of the poor and vote to repeal the Slidell panhandling ordinance" or to "think of the poor and support the Catholic Church." Indeed, an individual can encourage charitable donations—*i.e.*, "think of the poor and donate to your favorite religious charity" or "think of the poor and donate to Governor Edwards"—without registering and being licensed in the City. *See id.* § 20-4(g)(2); *id.* § 20-8(b). *But see id.* § 20-4(f) (licensing requirement for "professional fundraisers"). It is only when an individual asks for immediate personal charity ("think of the poor and please help me")—speech that cannot be pigeonholed as purely commercial*, see, e.g.*, *Loper*, 999 F.3d at 704—that the individual must go register with the chief of police.

Slidell cannot respond that it treats all requests for immediate exchanges of money—*i.e.*, solicitors, peddlers, and panhandlers—equally. (If it did, Slidell would not have had to pass a separate panhandling ordinance in the first place.) For example, panhandlers must go to the police station to get temporary panhandling permits. They must then return to the *police station* seventy-two hours later or the temporary permit expires. *See id.* § 11-207(b)(1)-(2). Meanwhile, commercial solicitors need only visit the *finance department* once. *See id.* § 20-8(a). And, as yet another example, the provisions have different eligibility criteria: convicted murders

are evidently trustworthy enough to be peddlers five years after they are convicted, *id.* § 20-5(4), but they are not acceptable panhandlers until twenty years after conviction, *id.* § 11-207(b)(2).

So Slidell imposes unique burdens on panhandling that it does not apply to other forms of solicitation. Those content-based burdens on a certain type of solicitation preclude the City from relying on *Schaumberg*'s endorsement of reasonable solicitation regulations. The ability to pass reasonable time, place, or manner restrictions on non-commercial solicitation does not carry with it the power to pass *content-based* time, place, or manner restrictions on non-commercial solicitation. *Cf. R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 386 (1992) ("[J]ust as the power to proscribe particular speech on the basis of a noncontent element (*e.g.*, noise) does not entail the power to proscribe the same speech on the basis of a content element; so also, the power to proscribe it on the basis of *one* content element (*e.g.*, obscenity) does not entail the power to proscribe it on the basis of *other* content elements.").

Because Slidell is imposing unique content-based burdens on certain types of non-commercial solicitation, the panhandling ordinance must be analyzed under strict scrutiny. *See Reed*, 135 S. Ct. at 2228 (majority opinion) ("A law that is content based on its face is subject to strict scrutiny regardless of the government's benign

motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech.").[3]  The Court proceeds to that inquiry.

### E.

Under strict scrutiny, the panhandling permitting requirement "can stand only" if Slidell can prove the scheme "furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*, 135 S. Ct. at 2231 (internal quotation marks omitted).

At the outset, the Court agrees with Slidell that public safety—Slidell's claimed compelling interest (R. Doc. No. 32, at 8 n.5)—can qualify as a compelling interest.  However, the Court has serious doubts as to whether Slidell has actually substantiated that it has a public safety problem relating to panhandling.

Slidell claims that it has an unaddressed problem with panhandling and solicitation-based offenses that endangers public safety.  Slidell bases that argument on the seventy complaints it has received since 2015 as well as a supposedly decreased number of panhandling arrests over the last five years.  *See* R. Doc. No. 30-1, at 14-15.  Slidell suggests that the data indicates that it has a decreasing ability to identify and arrest panhandlers, and that the citizens of Slidell are therefore reasonably concerned about the ability of their police to respond to episodes of aggressive panhandling.

---

[3] A different standard of review would apply to content-based burdens on commercial speech.  *See IMS Health Inc.*, 564 U.S. at 571-72 (discussing the appropriate level of scrutiny applied to content-based burdens on commercial speech).

That is an odd argument in many ways. In the first place, a decreasing number of panhandling arrests would seem to suggest that panhandling is becoming *less*—and not *more*—of a problem in Slidell. And though Slidell tries to explain that trend by suggesting that it results from Slidell's decreasing ability to identify panhandlers, Slidell does not explain *why* it is becoming less able to identify panhandlers. Slidell's proposition is far from obvious; the widespread adoption of smartphones would seemingly make it easier—and not harder—to identify abusive panhandlers. But even more to the point, a mere seventy complaints since 2015—which breaks down to just a handful of complaints per month in a city of over twenty-five thousand—does not substantiate an epidemic of panhandling. Without more, fifty-six incidents over two years where the police could not identify a panhandler does not provide a strong justification for burdening speech. *Cf. McCullen v. Coakley*, 134 S. Ct. 2518, 2539 (2014) ("For a problem shown to arise only once a week in one city . . . creating 35-foot buffer zones at every clinic across the Commonwealth is hardly a narrowly tailored solution.").

However, this is summary judgment. The Court must give Slidell the benefit of every favorable inference. So the Court will be overcautious and assume that Slidell has demonstrated an increasing trend of aggressive panhandling. And the Court will also be doubly overcautious and assume that making panhandlers wear nametags—even the Court has some skepticism that violators of the panhandling ordinance will violate the panhandling ordinance with their nametags visible—will

promote public safety. Slidell still does not demonstrate that the ordinance is narrowly tailored.

In particular, Slidell fails to justify a blanket registration requirement. Panhandling may be annoying to the residents of Slidell, but that does not establish that *all* panhandling is a threat to public safety. And at best, the City's summary judgment evidence demonstrates that the City is presently having some difficulty identifying aggressive panhandlers and the ordinance would aid Slidell in enforcing its law. That is an insufficient showing to justify such a sweeping registration requirement on prospective panhandlers. "[T]he prime objective of the First Amendment is not efficiency." *McCullen*, 134 S. Ct. at 2540. Therefore, Slidell's showing that the panhandling ordinance would make the police's "job so much easier" does not—on its own—demonstrate proper tailoring. *Id.* (internal quotation marks omitted).

To demonstrate that the ordinance is "narrowly tailored to achieve" Slidell's compelling interest, *Reed*, 135 S. Ct. at 2231 (internal quotation marks omitted), the City must show that it is using the "least restrictive means to further" public safety, *Playboy Entm't Grp, Inc.*, 529 U.S. at 813. "To do otherwise would be to restrict speech without an adequate justification, a course the First Amendment does not permit." *Id.* Slidell does not make that showing.

There are a number of potentially less restrictive alternatives to a universal panhandling registration requirement. The City could allocate additional police resources to enforce the rules against aggressive panhandling (Slidell City Code § 11-

207.1) and soliciting on public highways (*Id.* § 11-207.2). *Cf. Bartnicki v. Vopper*, 532 U.S. 514, 529-30 (2001) ("The normal method of deterring unlawful conduct is to impose an appropriate punishment on the person who engages in it. If the sanctions that presently attach to a violation . . . do not provide sufficient deterrence, perhaps those sanctions should be made more severe. But it would be quite remarkable to hold that speech by a law-abid[er] . . . can be suppressed in order to deter conduct by a non-law-abiding third party."). The City could install cameras or other technological devices at locations frequented by panhandlers to aid in the identification of aggressive panhandlers. *See Catholic Leadership*, 764 F.3d at 429 (suggesting court should consider technological alternatives to burdening speech in strict scrutiny analysis). Indeed, even if the City could make the threshold showing that some sort of nametag was necessary to identify certain panhandlers, the City could still achieve that goal by imposing a less-burdensome registration requirement as a sanction for non-compliance with Slidell's panhandling rules (*e.g.*, requiring violators of the aggressive panhandling ordinance to wear an identification tag for an escalating number of months). All of those approaches would be less burdensome than a blanket pre-registration requirement that burdens all prospective panhandlers, and Slidell cannot survive strict scrutiny without showing why less burdensome alternatives would be ineffective. *See Playboy Entm't Grp, Inc.*, 529 U.S. at 813. There is nothing illegal about being poor and needing assistance, and Slidell cannot take "a sledgehammer to a problem that can and should be solved with a scalpel." *Browne*, 136 F. Supp. 3d at 1294.

The panhandling ordinance also goes too far in "prohibit[ing] protected speech that poses no threat to public safety," *Browne*, 136 F. Supp. 3d at 1292, by requiring panhandlers to apply for a permit "between 9 A.M. and 5 P.M. on any weekday." Slidell City Code § 11-207(b)(1). That requirement constitutes a de facto ban on spontaneous weekend panhandling on the streets and sidewalks of Slidell.

Slidell cannot use a permitting requirement to preclude all spontaneous weekend panhandling on its public streets and sidewalks without a persuasive explanation as to why permits can only be obtained on weekdays. *Cf. Catholic Leadership*, 764 F.3d at 440-41 & n.40 (observing how the registration requirement at issue preserved the ability to engage in spontaneous speech on the weekend, and explaining that the case would be "vastly different" had Texas required registration before any speech at all). And Slidell never explains why it would be impractical for prospective panhandlers to obtain permits on the weekend.

For either reason—or both—Slidell's permitting requirement fails strict scrutiny because it is insufficiently tailored to achieve its stated end and unnecessarily burdens protected speech on the public streets and sidewalks of Slidell. The Court therefore neither addresses whether plaintiffs have standing to challenge the eligibility requirements for panhandling permits in Slidell nor whether it is constitutional for Slidell to preclude individuals with certain criminal convictions

from panhandling. Nor does the Court address the argument that the ordinance unconstitutionally denies plaintiffs the right to panhandle anonymously. [4]

**F.**

The Slidell panhandling ordinance is unconstitutional under the First Amendment insofar as it requires plaintiffs on the public streets and sidewalks of Slidell to obtain a permit before panhandling. But, as stated, the plaintiffs waived their pre-enforcement as-applied challenge in favor of a facial challenge, *see* R. Doc. No. 40, and facial challenges have substantive requirements beyond those required for an as-applied challenge, *see Catholic Leadership*, 764 F.3d at 425-26. Therefore, the Court must now determine whether plaintiffs meet the prerequisites for a successful facial challenge.

The Supreme Court recognizes two types of facial challenges in the First Amendment context. *See Stevens*, 559 U.S. at 472-73. First, a plaintiff may facially invalidate a law by demonstrating that there are "no set of circumstances . . . under which [it] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). The plaintiffs do not meet that standard.

Thus far, the Court has only considered the constitutionality of requiring a panhandling permit before panhandling on the streets and sidewalks of Slidell. But the panhandling ordinance applies to *all* panhandling in Slidell's city limits—Slidell

---

[4] The Court *does not* hold that every restriction on panhandling necessarily fails strict scrutiny. The interrelated challenges of urban homelessness and panhandling pose tremendous challenges for civic officials. Some panhandling-specific restrictions may well survive strict scrutiny. But a city must do more than substantiate the existence of fifty-six unidentified panhandlers to have a chance of doing so.

City Code § 11-207(a)—not just panhandling on the public sidewalks and streets that "facilitate the daily commerce and life of" Slidell, *Kokinda*, 497 U.S. at 728 (plurality opinion). And the Court's analysis of the constitutionality of requiring a permit before an individual may panhandle in public forums in Slidell may not necessarily carry over to all possible panhandling locations within the city limits of Slidell. *Cf. Cornelius v. NAACP Legal Def. and Educ. Fund, Inc.*, 473 U.S. 788, 808-09 (1985) (explaining that the level of scrutiny for speech restrictions in a non-public forum differs from the level of scrutiny for speech restrictions in a public forum). To take an extreme example, Slidell can likely require a panhandler to obtain a permit in order to panhandle *in* the Mayor's office. Because the Court has not determined that it would be unconstitutional to require a permit to panhandle at all locations within Slidell city limits, it cannot facially invalidate the entire panhandling ordinance under *Salerno*'s test for facially invalidating legislation.

That means the plaintiffs have to pursue the second method for invalidating laws under the First Amendment: an overbreadth challenge. In an overbreadth challenge, "a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Stevens*, 559 U.S. at 473 (internal quotation marks omitted).

The panhandling ordinance is substantially overbroad. The ordinance unconstitutionally requires a prior permit to panhandle on the public streets and sidewalks of Slidell. Those streets and sidewalks are likely *the* prime location to panhandle as well as the location where the vast majority of the panhandling in

Slidell occurs. Therefore, even if the ordinance has some legitimate sweep insofar as Slidell may constitutionally require a permit to panhandle at some locations within city limits, that legitimate sweep is inevitably dwarfed by the law's unconstitutional applications.

This is not a situation where the Court can narrowly interpret the panhandling ordinance to apply only to locations where Slidell can constitutionally require a panhandling permit. The plain text of the Slidell panhandling ordinance requires a permit to panhandle anywhere within the city limits. Thus, the panhandling ordinance may not be saved by a narrowing construction because the ordinance is not "readily susceptible" to such a narrowing construction. *Stevens*, 559 U.S. at 481 (internal quotation marks omitted). "It is not" this Court's "job to determine the maximum possible imposition on speech" that Slidell "may enact, and save" the panhandling ordinance "by re-writing it contrary to its plain text so that it embodies the maximum constitutionally permissible limit on speech." *Catholic Leadership*, 764 F.3d at 434.

The panhandling ordinance is facially unconstitutional under the overbreadth doctrine. The Court therefore need not—and does not—determine whether there are any locations in Slidell in which Slidell could require all prospective panhandlers to obtain a permit.[5]

---

[5] The Court stresses that it has only determined that (1) it is unconstitutional to require all prospective panhandlers to obtain a permit before panhandling on the streets and sidewalks of Slidell and (2) that defect makes Slidell's panhandling ordinance—*i.e.*, Slidell City Code § 11-207—fatally overbroad. The Court's ruling neither considers nor addresses the various other provisions of the Slidell City Code

## VI.

Having determined that the panhandling ordinance is facially unconstitutional under the overbreadth doctrine, the Court must consider whether to issue an injunction against enforcement of the panhandling ordinance.

After considering the traditional equitable factors governing issuance of a permanent injunction, *see eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006), the Court concludes that an injunction is warranted. Plaintiffs' loss of their First Amendment freedoms is an irreparable injury for which they lack an adequate remedy at law. *See Palmer ex rel. Palmer v. Waxahachie Indep. Sch. Dist.*, 579 F.3d 502, 506 (5th Cir. 2009). The balance of hardships between plaintiffs' ability to assert their First Amendment and Slidell's interest in identifying a handful of unknown panhandlers each month tips sharply in favor of the plaintiffs. *Cf. N.Y. Progress & Protection PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) ("[T]he Government does not have an interest in the enforcement of an unconstitutional law." (internal quotation marks omitted) (alteration in original)). Finally, the public interest favors an injunction. "[I]njunctions protecting First Amendment freedoms are always in the public interest," *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013) (internal quotation marks omitted), and Slidell points to no sufficiently weighty competing public interest that outweighs the public interest in enforcing First Amendment protections, *cf. Def. Distributed v. U.S. Dep't of State*, 838 F.3d 451,

---

addressing permissible conduct by panhandlers when panhandling. *See, e.g.*, *id.* §§ 11-207.1-11-207.2.

458-61 (5th Cir. 2016) (holding that the interest in national security and the national defense outweighed interest in protecting First Amendment rights, but also observing that "[o]rdinarily, of course, the protection of constitutional rights *would* be the highest public interest at issue in a case.").

## VII.

This Court's determination that Slidell's panhandling ordinance is substantially overbroad and therefore facially unconstitutional necessitates a denial of Slidell's motion for summary judgment. The Court leaves for another day the question of whether there is any location in Slidell where the City may require all prospective panhandlers to obtain a permit.

## VIII.

Accordingly,

**IT IS ORDERED** that plaintiffs' motion for summary judgment is **GRANTED. IT IS HEREBY DECLARED** that Slidell City Code § 11-207 is facially unconstitutional.

**IT IS FURTHER ORDERED** that defendants, the City of Slidell, Freddy Drennan, and Eugene Howard, are **ENJOINED** from enforcing Slidell City Code § 11-207.

**IT IS FURTHER ORDERED** that Slidell's motion for summary judgment is **DENIED.**

**IT IS FURTHER ORDERED** that a status conference is set in this matter for **2 P.M.** on **June 26, 2017** in the chambers of the undersigned. Counsel may

participate by phone if the Court is provided with a telephone number prior to the conference.

New Orleans, Louisiana, June 19, 2017.

**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**